CLAYTON (BATTEN v.). See Case No. 1,105.

CLAYTON (GRUBB v.). See Case No. 5,-849a.

CLAYTON (HAMMEKIN v.). See Case No. 5,996.

---

## Case No. 2,871.

### CLAYTON et al. v. The HARMONY.

[1 Pet. Adm. (1807) 70.][1]

District Court, D. Pennsylvania.

SALVAGE—RESCUE OF PRIZE—COMPENSATION—SEAMEN—SUSPENSION OF WAGES BY CAPTURE.

1. The Harmony, bound to Philadelphia from Great Britain, was captured by a French vessel of war, part of her crew, &c., taken out, and ordered to Rochelle. The libellants and others, seven in number, including two female passengers, rose on the French prize-master and his crew, ten in number, rescued the Harmony, and brought her into Philadelphia. One fourth of the whole value of ship and cargo allowed as salvage.

[Cited in Hart v. The Littlejohn, Case No. 6,-153.]

2. The contract between owners and mariners suspended by capture, as to all claims for wages.

[Cited in Strout v. The Cuba, Case No. 13,-549.]

3. No difference, in justice, whether rescue by ship's crew, or those of another vessel.

4. Captors enemies on the sea.

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[1] [Reported by Richard Peters, Jr., Esq.]

5. Legal obligations on mariners continue in cases of wreck, but not to rescue captured property.

6. Rewards beyond wages given to mariners, saving from wreck. Not fixed, but vary according to circumstances.

[Cited in The Massasoit, Case No. 9,260.]

7. No salvage allowed to fraudulent claimants.

8. Policy and justice of liberal salvage.

9. Quantum of salvage, on what principles adjusted.

10. Salvage on recaptures, by act of congress.

11. Wages from last port of delivery in part of shares of salvage.

### BY THE COURT.

The libel states, that the ship sailed from Portsmouth in Great Britain, on the sixth of April in the present year, under convoy, from which she parted on the twenty-second of May following, and while proceeding on her voyage to Philadelphia, to wit, on the twenty-seventh of the same month she was captured by a French corvette commanded by a Captain Gallabert. That the captain of the Harmony, the officers, seamen and passengers, were taken on board the corvette, except the libellants, who were suffered to remain in the Harmony, on board whereof were put three French officers and seven seamen, who were ordered to conduct her into Rochelle in France. That the ship being on her way to Rochelle, on the twenty-ninth of May, she having been forty-eight hours and upwards in possession of the captors, was recaptured by the libellants and the mate of the said ship Harmony. The ship and cargo are stated to belong to Messieurs Crawford and Company, of Philadelphia, and divers other citizens of Pennsylvania. The prayer is, for such part of the value of ship and cargo to be awarded to the libellants, as shall be found due, according to the laws of the United States or by the laws of nations. The answer of James Crawford and Company, owners of the ship, in behalf of themselves and the owners and consignees of the goods, accords with the allegations of facts in the libel, as to the capture, but states that Anne and Esther Collet, two female passengers, were also left on board the Harmony. It also states, that considerable quantities of goods were plundered from the cargo by the French captors, the amount whereof, at the time of filing the libel, was unknown. The respondents allege, that Brown and Revel were articled seamen, that Clayton was a passenger, and had goods on board, as was also Ardley; but the latter was not an active party in the recapture, he having remained neuter. That the mate, John Nelson, was the principal author and agent in the recapture, to whose courage and abilities it was chiefly due; and that Anne and Esther Collet assisted, to the best of their abilities, therein. The respondents deny, that by reason of the premises, the libellants are entitled to salvage by the laws of the United States, or of nations, and pray, that the libel be dismissed with costs, &c. The libellants reply, that, though Clayton had goods on board, to the value of three hundred pounds sterling, they were insured in London, and that Ardley had no goods on board, and was a party to the enterprise, and did co-operate in the recapture. They allow that Nelson exerted himself for the rescue of the ship, but he could not have effected it, without their co-operation and assistance; but they deny that the recapture was chiefly due to his courage and abilities, or that he was the author thereof. They allege, that it was, in an essential degree, due to the courage, the arms and the abilities of the libellants, that the enterprize succeeded.

The testimony, of all the witnesses, concurs in the leading circumstances of the rescue, which was accomplished when the vessel had been forty-eight hours in possession of the enemy, by the joint efforts, of all the passengers and crew of the Harmony, left on board by the captors. There is no doubt, however, that some had more active merit and agency than others. The evidence with respect to Robert A. Ardley, is the least clear and intelligible. It would take up too much time to abridge the arguments of the counsel for the libellants, to whom I am obliged for many of the observations I shall hereafter make. It is contended, on the part of the respondents, that there is no positive law of the United States (the acts of congress only operating on the cases therein enumerated, and this is not one) or any adjudged case under the laws of nations, to warrant the claim of salvage, which is an imperfect right, like that to compensation for saving a house on fire, or goods in it—rescuing a person or his property from ruffians, robbers, &c. depending on the generosity of the persons benefitted. That the mariners are the servants of the owners, and are bound to recover the ship, whether wrecked or captured, or lose their wages, and they shall not be paid for doing their duty.[2] That the passengers or some of them, had goods on board, and if they were insured, they had the profits, if saved, in contemplation; the personal liberty of all was an object worth the contest. None of these could be obtained without recapturing the ship and cargo, which remained the property of the owners, until brought infra praesidia of the captors, and condemned in a court of admiralty. It was conceded, that such condemnation would, in all probability, have taken place if the property had been brought within the power of a French tribunal. It was prevented, by the recaptors, from going into a French port, to benefit themselves, and not the owners; but, if the property was not changed by the capture, the libellants can claim no part, it being

[2] See 2 Azuni. Mar. Law (N. Y. Ed.) p. 274, and note cited from Emerig. Traité des Assur. p. 505: a similar doctrine held in argument; but the crew, rescuing the prize, were rewarded.

wholly in the owners of the ship and goods. If the capture made it enemy's property, and divested the rights of the owners, then the recapture, if lawfully made, was prize to those who took it. Therefore, in either case there can be no right of salvage, nor is there any remedy either at common law or in the admiralty; there being no legal obligation on the owners to comply with such a demand. That it is dangerous to allow the principle of salvage, in case either of wreck or rescue by the crew; the mariners would, in one case, be tempted to run ships on shore; and, in the other, to submit to a trifling force, that, by saving the ship and goods, or recapturing them, they might obtain an unmerited reward. That, if there is an allowance for salvage in this case, a discrimination must be made between the salvors, and the female passengers should share the compensation given; from which Mr. Ardley should be totally excluded, as not being active, or any wise concerned in the recapture.[3]

I think much has been said in this cause, tending to perplex, however unintentionally, a plain question, and, by no means relevant to the subject of enquiry. I did not anticipate, from counsel so truly respectable, such laboured opposition to compensation, under a plain principle of common law and common justice, evident to the most moderate understanding, and mentioned by Lord Holt, in the case of Hartford v. Jones, 2 Salk. 654: "He that serves another, ought in reason to be paid for his service." In the same case, this great and able judge, who was well acquainted with the general subject of laws, though peculiarly eminent in those of his own country, declares that, "salvors of goods cast away and saved may retain for payment, as a carrier for his hire; and salvage is allowed by all nations."—See, also, 1 Ld. Raym. 393. It is unfortunate that books reporting admiralty adjudications are rare. If the proceedings of these courts were published, the respondents' counsel would, no doubt, have had it less in their power to make the objection, that adjudged cases, to establish the libellant's claim, could not be shewn. This assertion, however, is not supported. There are not only particular instances, quoted from writers on the laws of nations, but clear and decided opinions, from the most distinguished authorities, adduced to

warrant the present claim: nor are instances wanting, of cases determined in the courts of this country, both of common law and admiralty jurisdiction, as well those of the United States, as of the individual states. Though the cases, similar in circumstances are few, as they but seldom occur, the principles of the claim are supported by many authorities. See 2 Wood. El. Jur. 429–434; 1 Inst. Adm. 53–55, and authorities there cited; Lee, Capt. 95–100; 19 Vin. Abr. 275; Salk. 35; 2 Valin, Comm. 258; Wesk. Ins. 499, and many others. It is unnecessary to enquire into the motives inducing the recapture, or rescue. Speculative, or interested investigators, who, in analyzing the human mind, view the dark side of human nature, find that the best actions of men spring from selfishness. I do not envy them this discovery, or the humiliating reflections which flow from it.—It is enough for our present purpose, that the recapture has been made; and, that the owners of the ship and cargo have recovered their property to a very great amount. The benefit accruing to them, and not the motives, but the services of those, who, at the risk of their lives, and with highly meritorious exertions, restored, what would otherwise have been totally lost, are the leading objects of our present enquiry.

In opposition to the claim of the mariners, the cook and the steward, and the same objection lies to the mate, it has been stated, that they were the servants of the owners, and bound to recover the ship and cargo, or lose their wages. To these they were entitled, up to the time of arrival at the last port of delivery and for half the period of stay there, though the vessel and cargo had been lost; so that the part of their wages, put in jeopardy by the capture, was a small object. Nor is the benefit derived to the owners the less, because, in serving them, the salvors regained their personal liberty, and, with it, some advantages to themselves. But it appears to me, that the contract between the mariners and the owners, was suspended—see note in the case of Brevoor v. The Fair American [Case No. 1,847]—or (as it respects any thing occurring thereafter) dissolved by the capture. Nor was the recovery of the ship and cargo from enemies, any part of the original contract with the seamen. 1 C. Rob. Adm. (Phila. Ed.) 234. I am confirmed in this opinion by Bynkershoek (2 J. P. l. i. c. 20), who says in a case similar in principle, though not in circumstances, "The owners and freighters of the vessel hired the mariners for the purpose of merchandizing only; and not to cruise for booty." This eminent writer puts the case of the company of a merchant ship, without commission, being attacked, and taking the ship assaulting them. He determines that the whole of the capture ought to go to the captors. In England there is a statute declaring how such capture shall be distributed, to wit, "That the officers and mariners shall receive such

---

[3] Authorities cited by Ingersoll and Lewis, for libellants: 2 Wood. El. Jur. 448, 432, 428–430; Moll. de J. Mar. bk. 2, c. 5, § 4; 19 Vin. Abr. 275; Lex Merc. Red. 157; Wesk. Ins. 499; Kames. Eq. 10–172; 2 Salk. 654, pl. 2; Lee, Capt. 97–100; 1 Ld. Raym. 393; Mal. Lex Merc. 119, 106, 108; acts of congress relative to captures, &c., from French; 2 Valin, Comm. 258; 1 Jour. Old Cong. 260; 2 Jour. Old Cong. 13; 2 Burrows. 695; Lee, Capt. 78, 82; 2 Burla. Nat. 295, 15–18; Inst. Adm. 503, 504; 12 Mod. 134; 2 Wils. 213; Brooke. Prop. pl. 18, 38; Lee, Capt. 232, 238; Salk. 35.

By Rawle and Tilghman for respondents: 1 Emerig. Mar. Loans. 123; 2 Valin, Comm. 713; Lee, Capt. 86, 8; 2 Wood. El. Jur. 456; Wesk. Ins. 17; Inst. Adm. 54; 4 Bac. Abr. 616; 4 Com. Dig. 271, 16; Vin. Abr. 411, pl. 43.

share of the condemned ship and goods, as is usually practised in private men of war. Wood. El. Jur. 434. Whether the retaking be from pirates or enemies, does not alter the principles of justice; nor do I see any important distinction between a crew in another ship, taking or recapturing a vessel, or the crew and passengers of a ship, taken, vanquishing the captors and restoring the property; the latter, no more than the former, being under no obligation, thus hazardously, to serve the owners. As to passengers, there is no pretence of a contract, between them and the owners. In the enterprize there is more hazard and less means, and, of course, more merit in a recapture or rescue under the present circumstances, than in a retaking by an armed vessel, whether public or private. Be this as it may, the recaptors eminently served the owners, and "ought in reason to be paid for their services." There being then, clearly a right, the law would be very inefficient and defective indeed, if it did not give a remedy, but left the salvors at the mercy, or, as it is said, generosity of the owners. There is certainly a legal remedy, and it being a transaction within the jurisdiction of the admiralty, the remedy is here properly pursued.

Under the foregoing view of the subject, it is useless to discuss the point, insisted on by the respondent's counsel, of the property remaining in the owners, until a condemnation in a court of the captors. My opinion on this point has been given long since. Besides, there is no dispute here, about the property; for on the restoration of it, the whole claim to salvage rests. It is a claim for compensation, and not a claim to property.

That the French, on the sea, are our enemies, I have, on a former occasion, given my reasons for deciding.[4] That this vessel and cargo would have been condemned in a French court, is not denied. I consider the recapturing, in the present instance, as certainly within the equity and principles of the prize acts, if I may so call them, of con-

gress, so far at least as to authorize the recaptors to consider the captors as enemies, from whom the spoil might be lawfully wrested. The rewards given by these acts to those within their terms, shew the sense of the legislature, as to all who are within their spirit and meaning. If it be granted, as it ought to be, that there is a similarity in principle between this case and that of ships and goods saved from wreck, I have no doubt that the same reasoning and law will apply. If there be a difference in the cases, it is favourable to the libellants; the legal obligations on the mariners continuing in the case of wreck, and not existing in that of re-capture. Although seamen are bound, if possible, to save a ship and goods wrecked, or lose their wages, they are also entitled to further compensation, by way of salvage. 1 Pet. Adm. 55 [Taylor v. The Cato, Case No. 13,786]. In some countries they have daily wages, by special ordinances or practice. But in all countries they are allowed more than their wages; if the property saved warrants this extra claim. This allowance is variously determined, according to the circumstances of the cases respectively. I could refer to many authorities and marine regulations, in addition to those before cited to prove this position. Even Wesket, who probably was largely concerned in insurances, as an underwriter, allows this to be law, though as has been observed by the counsel for the libellants, he closes his chapter on the subject, querulously. As to others than mariners, saving goods or ships, their right to salvage is, unquestionably, just and legal. It is true that frauds and abuses may be committed by sailors, as well as others, let a general principle or practice be never so just. Vessels are run on shore to obtain the amount of insurances—but it is not argued from hence that no insurances ought to be made; or, that those who are bona fide entitled, should not recover. Those who do right, ought not to be deprived of their reward, because others have done, or may do wrong. No salvage would be allowed to fraudulent claimants.—It is not only dictated by the plain principles of justice, but it is highly politic to give the mariners, either saving from wreck or recovering by recapture, and restoring property, liberal salvage beyond a mere quantum meruerint. Abundantly more benefits will accrue to commerce, by encouraging recoveries of property lost, or in imminent danger, than will ever happen by any abuses arising from the establishment of a principle, so just in itself, and exemplary in its consequences. The business of this court has so much encreased, that I have found it not only useful, but absolutely necessary, to settle general principles, as well for my own convenience, as to facilitate the business of suitors. It is for this reason, that I have gone into the general subject so extensively. I add these observations, to those I made on claims to salvage, in the

---

[4] In a case of prize on the capture of a French armed vessel. The supreme court of the U. S. in the case of Talbot v. Seeman (1 Cranch [5 U. S.] 1), gave salvage to a ship of war of the United States, for the recapture of a Hamburg vessel, out of the hands of the French (France and Hamburg being then neutral to each other) on the ground that the Hamburger was in danger of condemnation under the French arret of 18th January, 1798. In the same case (1 Cranch [5 U. S.] 31) the court considered the situation of France and the United States, in the year 1799, as a state of partial war. Sir William Scott has, in many cases, allowed salvage on recapture and rescue of neutral vessels from the French. See the case of the American ship, The Two Friends (M'Dougal, master), 1 C. Rob. Adm. (Phila. Ed.) 271, and a note to that case (page 284); the case of a Swedish ship, The War Onskan (Biedumpel, master), 2 C. Rob. Adm. 299; also the case of the Russian ship, The Eleonora Catharina (Kreagh, master), 4 C. Rob. Adm. (Phila. Ed.) 156.

case of Warder v. La Belle Creole [Case No. 17,165], that this point in its general principles may be at rest, in this court, so far as depends on me.

From a consideration of all the circumstances, it appears to me, that, according to the evidence and the situation and capacities of the male recaptors, they should be classed in the following order.

1. John Nelson, the mate. The cook, in a manner highly meritorious, first mentioned to the mate that "he did not think it right the ship should go to France." He may have expressed the first idea of the recapture, yet it does not follow that the mate had not conceived it, or that the cook was the author of the plan. It was sufficient for the mate, who reproved this venial loquacity in the cook, to find him ripe for the attempt. Animated, no doubt, by this favourable omen, the mate immediately proceeded to discover the inclinations of his intended coadjutors. Perceiving a proper desire to co-operate in all, except R. A. Ardley, who, for some cause or other, was kept entirely ignorant of the plan, he proceeded to combine and arrange the design, and advise and direct, as well as finally to take his share in the dangerous, but successful, attack on the French officers and crew. His nautical skill was indispensable, as well, to the favourable issue of the recapture, as ultimately, to render it of any use in bringing the ship into port; which is as much a part of the ground for a claim to salvage, as the act of recapture.

2. Mathew Clayton, a passenger, whose personal courage, ready assistance, when he had determined to co-operate, and successful combat with the chief officer of the prize, were among the leading circumstances, which contributed to the fortunate issue of the contest.

3. The cook, Stephen Revel, a man of colour, whose merit is very distinguished. His reward should follow the spirited and beneficial exertions of one, whose station in life does not always produce persons of such courage and good conduct.

4. James Bowen, the steward, a black, whose deserts in cheerfully undertaking, and bravely accomplishing, his part of the enterprize, entitle him to share the reward of such hazardous services. I have a pleasure in declaring, that these are not the only instances I have had judicially before me, of virtuous, patriotic, and spirited conduct, in men of the African race.

5. Robert A. Ardley. There is a contrariety of testimony as to Mr. Ardley—he was not previously acquainted with the plan of, or engaged as a combatant in, the recapture. When he received the blunderbuss (the only fire-arm then in possession of the victors) from the mate, is not clear; it was after the officers in the cabin were subdued, and a short time before the whole of the French crew were confined. He appears to have done as much as was expected of him, after confidence was placed in him. Perhaps, towards the close of the contest, his being armed, overawed those, who, though dismayed, had not entirely submitted. Through the passage, after the recapture, he took his share in the watch, and in guarding the prisoners, which enabled others to assist in navigating the vessel. These services, in which all the recaptors partook, were necessary to the final accomplishment of the design. The bringing the ship into port was an essential part; and there was constant danger of the French crew rising and retaking possession.

The female passengers, Mrs. Anne Collet, and Miss Esther Collet, I have not yet noticed. But I should do great injustice to their merit, if I did not mention them with high approbation.—The firmness of mind evidenced by both of these ladies, in the critical situation in which they were placed, is as honorable to them, as their humanity, in attending the wounded, after the contest was over: their risk, in case the attempt to recapture had failed, was peculiarly great. Miss Collet was actively useful during the last scene of the enterprize, by taking the helm, when her services, in this essential part of the business was required in execution of the plan, with which both were made acquainted by the mate in its origin. Nor were they without their share of merit in the preparatory arrangements for digesting and executing the design. I do not estimate the circumstance of Miss Collet's obtaining from the French commander of the corvette, the return of Mr. Clayton and the steward on board the Harmony. This was, no doubt, accidental, and without any view to the object their return ensured, but it is still a circumstance of good fortune to the owners, derived from her influence and address.—She lost, by the plunder of the French crew, the greater part of the goods she had on board.

As to the quantum of salvage, I have taken into consideration all the circumstances—of value of the property—bravery in retaking—labour and risk in the recovery, and bringing into port. I have had some reference to the acts of congress, and endeavoured to discriminate, as justly as I can, between the relative merits of the salvors. I have found, in all cases of salvage, that it is impossible to satisfy all parties, and therefore endeavour to satisfy my own mind. But I do not find this to be unattended with difficulties. The appraised value of the ship is eight thousand dollars. The value of the cargo, according to the estimate made at the custom-house, is, deducting duties, ninety-two thousand eight hundred ninety-five dollars, sixty-nine cents—in all, one hundred thousand eight hundred ninety-five dollars, sixty-nine cents. By the act of congress, of July 9th, 1798 [1 Stat. 579], recaptured American vessels and cargoes pay salvage, not less than one-eighth, or more than one-

half. By the act of March 2d, 1799 [1 Stat. 651], relating to public armed ships—American or friendly property in possession of the enemy more than forty-eight, and less than ninety-six hours, is liable to pay, on recapture, one-third part of the whole value. The expense of outfit was, no doubt, a consideration with congress in fixing the salvage. I have given less, than I otherwise should, to the present recaptors, as no such expense was incurred—I respect the principles of these regulations, though I am not bound to follow them exactly in the present case, which is not included in the acts. Considering the latitude allowed in the first act, of from one-eighth to one-half, without regard to time; and the fixed proportion of one-third in the second act, I have determined under all circumstances, to allow one-fourth part of the whole value of the ship and cargo to the salvors in full recompense for salvage, being the sum of twenty-five thousand two hundred twenty-three dollars, ninety-two cents. The wages of the mate, cook and steward, from the last port of delivery, to be in part of their shares of salvage respectively; and the costs and charges to be thrown on the remaining three-fourths. Had all those concerned in the recapture joined in the libel, I should have distributed the sum allowed as salvage, in the following manner and proportions. The whole sum to be divided into seven shares of three thousand six hundred and three dollars and forty-one cents each—whereof

1. John Nelson, the mate, to have two shares, or seven thousand two hundred and six dollars and eighty-two cents.

2. Mathew Clayton to have one share and an half, amounting to five thousand four hundred and five dollars and eleven cents.

3 & 4. The cook, Stephen Revel, and the steward, James Bowen, to have, between them, two shares. being seven thousand two hundred and six dollars and eighty-two cents, whereof the cook is to have three thousand eight hundred and fifty-three dollars and forty-one cents; and the steward three thousand three hundred and fifty-three dollars and forty-one cents.

5. Robert A. Ardley, half a share, or eighteen hundred one dollars and seventy cents.

6 & 7. Mrs. and Miss Collet, one share, or three thousand six hundred and three dollars and forty-one cents to be equally divided between them.

Therefore, I do hereby adjudge, order and decree, that the several libellants in this cause, have and recover the sums following, that is to say,

1. Mathew Clayton five thousand four hundred and five dollars and eleven cents.

2. Stephen Revel three thousand eight hundred and fifty-three dollars, and forty-one cents.

3. James Bowen three thousand three hundred and fifty-three dollars and forty-one cents.

4. Robert A. Ardley, eighteen hundred and one dollars and seventy cents.——The same to be in full satisfaction for their services, for the causes, in the libel mentioned. And I further adjudge, order and decree, that the said ship Harmony, with her tackle, apparel and furniture, and also her cargo aforesaid, be condemned, and that the same be sold by the marshal of this district, for the payment of the several sums of money herein before decreed to the libellants, respectively, and of the costs and charges, legally accruing in the premises.